**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN BAUGH, by and through his wife and next friend, Sharon Baugh | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No.  08 C 4204 |
| v. | ) ) | |
| CUPRUM S.A. de C.V., LOUISVILLE LADDER, INC. f/k/a LOUISVILLE LADDER GROUP, LLC and VERZATEC, S.A.B. de C.V., and IMSATEC, S.A.B. de C.V., | ) ) ) ) ) ) ) | HONORABLE DAVID H. COAR |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Baugh, through his wife and next friend, Sharon Baugh, filed this products-liability suit under Illinois law, alleging that he sustained a severe head injury from a fall caused by a sudden malfunction of his Cuprum type III model no. 608-05 ladder.  The parties being diverse, this court has jurisdiction pursuant to 28 U.S.C. § 1332.  All defendants have moved for summary judgment on Baugh's negligence and strict-liability claims.  For the reasons that follow, their motion is DENIED.

**FACTS**

On August 1, 2006, John Baugh sustained severe head injuries in an unfortunate accident of some sort.  It is undisputed that nobody saw the accident—or even saw Baugh working on his ladder that day—except for Baugh himself, whose traumatic injuries have left him unable to remember what happened.  Baugh alleges, however, that while he was on his Cuprum ladder replacing some rusty gutter screws on his house, the ladder's frame suddenly bent, causing him

to fall to his driveway. Baugh's physicians have stated that he sustained, among other things, an intracranial hemorrhage with bifrontal contusions complicated by seizures, and that he has severe, ongoing physical and cognitive deficits as a result of the trauma to his head. As detailed below, the court views the circumstantial evidence regarding the accident in the light most favorable to Baugh.

*Lori Strehl's Deposition Testimony*

On August 1, 2006, Lori Strehl lived across the street from Baugh on Marion Street in Wheaton, Illinois. Around 7:00 a.m. that day, Strehl saw Baugh inside his garage working with a toolbox. She was packing her car, which was facing her garage at the time. Strehl waved to Baugh, who waved back. She finished packing and went into her house for a couple of minutes. When she came back out, she strapped her two sons into the back seat of her car, backed out of her driveway, and headed west on Marion Street.

As Strehl backed out of her driveway, she saw Baugh sitting in the northwest corner of his driveway, near his garage. She waved to him again, but this time he did not wave back. Strehl saw that the ladder was down, too; it was laying on its right side on the driveway. Strehl grew concerned that Baugh had not waved back to her. So after traveling about a block and a half on Marion Street, she returned home. She pulled into Baugh's driveway and found him laying on his back. He sat up and wiped blood from his nose. His nostrils were still bleeding, there was a split on the back of his head, and his eyes were glazed. Strehl asked him whether he was okay, but he did not respond. There was a pool of blood on the driveway between Baugh and the ladder, which was facing the northeasterly direction. The leg on the right side of the ladder was bent upward below the brace. Baugh had a screwdriver in his right hand. Strehl found his glasses in his garage by the steps that lead into the house. Strehl testified that after the

accident, Baugh's wife Sharon told her that Baugh was going to change rusted gutter screws.

### *Therese Kushman's Deposition Testimony*

Therese Kushman was Baugh's next-door neighbor on Marion Street on August 1, 2006. When she exited her house that morning, she saw Baugh sitting on his driveway; Strehl was near him on her cell phone. The ladder was behind Baugh, on its side, with the top cap pointing in a two o'clock (i.e., northeast) direction and the right lower rail bent inward below the bottom step. Baugh and the ladder were both located in the northwest quadrant of the driveway. Baugh had a gash on the back of his head, and there was blood on the driveway. Kushman asked Baugh what had happened and how he was doing, but Baugh did not respond verbally. He did not respond to the paramedics either.

When Kushman and her husband went into Baugh's garage later on August 1, 2006, they found a package of gutter screws and some tools like the one Baugh had in his hand out on Baugh's tool cabinet. Baugh's wife Sharon told Kushman that Baugh had been planning to change the gutter screws while she was at work on August 1, 2006, because they were causing rust stains on the gutters.

### *Ed Troutman's Deposition Testimony*

Ed Troutman, a member of the Winfield Fire Department, responded to a call at Baugh's home on August 1, 2006. When he arrived at the scene at 8:05 a.m., he saw Baugh down on the ground in the northwest part of his driveway, facing southeast in roughly the five-o'clock position, with the ladder down on the ground near him. (Troutman could not be any more specific than that). The right leg of the ladder was bent in and the left leg was twisted. A screwdriver was on the driveway, within inches of Baugh; Baugh's glasses were found inside the garage near the door into the house. Troutman was unable to obtain any history or verbal

responses from Baugh, and nobody at the scene claimed to have witnessed the accident. Troutman left the scene at 8:15 a.m.

### *David Formento's Deposition Testimony*

David Formento, a lieutenant in the Winfield Fire Department, also responded. When he arrived at the scene, he saw Baugh sitting on his driveway facing south in roughly the five-o'clock position. The ladder was on its side in the northwest quadrant of the driveway, within two or three feet of Baugh. The top part of the ladder was closest to Baugh's back and faced northwest, in roughly the eleven-o'clock position, the same position Baugh's head was pointing. It appeared to Formento that Baugh had hit his head on the concrete. There was a pool of blood and Baugh's glasses were about twenty to twenty-five feet away from him.

Formento observed that the ladder was bent and described it as "definitely deformed." When he first saw it, he blurted out, "Oh my God, look at the ladder."[1]

### *Sharon Baugh's Deposition Testimony*

At the time of Baugh's accident on the morning of August 1, 2006, his wife Sharon had already gone to work in Chicago. She did not witness the accident. Although she has asked her husband what happened a "dozen times," he has been unable to remember anything. A couple of weeks before the accident, Baugh told Sharon that he planned to change some gutter screws because they were rusty, but he did not specify on which area(s) of the house.

Prior to August 1, 2006, Sharon used the ladder less than five times for household chores. She had no difficulty using or setting up the ladder, including the spreader braces. She did not find the ladder to be wobbly or unstable, and had no safety concerns regarding it. She never

---

[1] Nicole Aister was also identified as a paramedic with the Winfield Fire Department. In his answers to Defendants' supplemental interrogatories, however, Baugh stated that he would not call Aister as a trial witness. He also stated that he would not call as trial witnesses any of the four deputies with the DuPage County Sheriff's Police Department who investigated this matter.

complained to Baugh about the condition of the ladder or heard him complain about it either. Sharon "guessed" that her husband had used the ladder about ten times prior to the accident, for inside and outside chores. She did not know where or when he bought the ladder, and she was unaware of any sales receipt or other proof of purchase for the ladder. Furthermore, Baugh did not provide any information regarding the date or place of purchase of the ladder in his response to Defendants' first request to admit on September 11, 2009. He relied on this court's order, dated September 2, 2009, barring him from testifying at trial.

### *Thomas Schmitt's Deposition Testimony*

Thomas Schmitt worked for Louisville Ladder from 1981 to 1996. Initially, he was a product design engineer; he became manager of product engineering in 1987. He left the company in 1996 but returned in August of 2008.

Schmitt testified that Baugh's Cuprum type III model no. 608-05 ladder was made on October 24, 1994 in a facility in Monterrey, Mexico. This was the highest selling model from 1994-1996, and 153,198 of these ladders were sold from 1989 to 2003. Schmitt described the manufacturing and distribution timeframe that—generally speaking—applied to model 608-05 ladders as follows. 1,000 ladders were manufactured per shift. After the ladders were assembled, they were palletized on skids and put into the finished goods warehouse. Because this was a high-volume model, the ladders would typically stay in the warehouse for no longer than one week, but could remain there for up to a month. Schmitt further testified that—hypothetically speaking—if Baugh's ladder was sold through a distribution center in the United States, it would have taken one week to get there, and it would have remained there for one week to two months. The subsequent shipping time from the distribution center to regional locations—regular shipments were made to Builders Square, HQ, Hechingers, and Kmart from once a week to once

a month—was no more than a week. Typically, a model no. 608-05 ladder would remain in a retail store from one to two months, and not more than six months. Schmitt therefore opined that, during the relevant timeframe, a model no. 608-05 ladder would generally be sold within ten months of production.

### *Dr. Douglas Ambler's Deposition Testimony*

Dr. Douglas Ambler was Baugh's family physician and internist; he examined Baugh on multiple admissions to DuPage Hospital. At his deposition, Dr. Ambler testified that Baugh told him that he fell from a ladder and sustained injury. However, Dr. Ambler had no specific recollection of when Baugh supposedly said this, and he could not point to any contemporaneous medical record in which he documented this statement. Moreover, Baugh was unable to provide a history the first two times he saw Dr. Ambler, in August and October 2006, due to his cognitive dysfunction.

Dr. Ambler testified that Baugh sustained bifrontal contusions, indicating that a blow to the back of his head pushed the front of his brain into the frontal bones in his head, and that his head injury is the cause of his ongoing physical and cognitive deficits. Dr. Ambler specifically ruled out the possibility that Baugh had a stroke. He further testified that Baugh has adult-onset diabetes but that his blood-sugar levels and blood-sugar medications were both well controlled at the time and posed no risk of dizzy spells, and that Baugh did not suffer from dizziness.

### *Expert Testimony*

At the request of Baugh's attorney, Dr. Sheldon Mostovoy, Associate Professor of Mechanical and Aerospace Engineering at the Illinois Institute of Technology, performed destructive testing on the ladder in January 2008, before this lawsuit was filed. Professor Mostovoy performed hardness testing in order to determine whether the ladder was made of an

appropriately hard metal, and whether the hardness was consistent from top to bottom. Baugh's attorney also told Professor Mostovoy that Baugh was somewhere on the ladder at the time of the accident, but that he did not know where—just that Baugh was not at the bottom or at the top.

At his deposition, Professor Mostovoy testified that the aluminum was of an appropriate hardness for ladders, and that the hardness was very consistent from the top to the bottom of the ladder. Thus, Professor Mostovoy opined that—in terms of the metal used—Baugh's ladder had been properly manufactured. But he further testified that "whether it was safe for whatever it was made is a design issue, which I was not asked to do anything with." He had no opinions regarding the facts and circumstances of Baugh's accident.

More tests were subsequently performed on the ladder by R. Kevin Smith, President of R.K. Smith Engineering, Inc., and Dr. Jack Vinson, H. Fletcher Brown Professor Emeritus of Mechanical and Aerospace Engineering at the University of Delaware. Professor Mostovoy later concurred with the results of these tests.

Smith's report states, among other things, that the physical condition of the ladder is consistent with the right leg buckling inward and the left leg receiving an outward thrust load at the leg/ground interface, and that this indicates structural failure rather than a post-tipover impact blow to the ladder leg. Smith opined that a properly designed ladder would not be subject to this sort of structural failure and damage, "[n]o matter what Mr. Baugh was specifically doing while on the ladder, or where he was positioned on the ladder . . . ." Smith further stated that "other than the damage to the lower legs from the accident, and a bend in the pail shelf, the ladder appeared to be in like-new condition. There is no evidence that the subject ladder's lower rail sections were damaged before the accident."

Professor Vinson concluded that the ladder "possesses design defects such that it is not

capable of withstanding the stresses generated in the side rail and shear braces during foreseeable use." He performed a structural analysis of the ladder in order to calculate the total stress that would occur at the failure site when a man of Baugh's roughly 200-lb. weight (and five-foot-eleven-inch height) was standing in various positions—including above the right side rail, concentrating the force in the right side rail only; directly in the middle of the ladder from left to right; positioned so that the resultant of the vertical load would be halfway from each edge of the footpad—on the ladder. In each scenario, he found that the resulting force would be substantially above the 35,000 psi yield strength of the 6105-T5 aluminum of which the ladder was constructed and the 28,000 psi of buckling stress that the side-rail flange could handle. Each scenario would result in ladder failure and Professor Vinson therefore opined that the ladder suffered from a "major design defect."

## **SUMMARY JUDGMENT STANDARD**

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in his pleadings or conclusory statements in affidavits; he must support his contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary

judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## ANALYSIS

### *Negligence*

Defendants argue that they are entitled to summary judgment on Baugh's negligence claim because the undisputed facts cannot support an inference that a defect in his ladder was the proximate cause of his injuries.[2] The court disagrees. The circumstantial evidence and expert testimony establish a genuine issue of material fact as to whether Baugh's accident was caused by a structural failure of his ladder.

There is nothing problematic or unique about the use of circumstantial evidence to fund an inference of proximate cause in the context of a negligence action.[3] Contrary to Defendants' cited cases purporting to establish various heightened requirements for this purpose, *see, e.g.*, *Bickerman v. Wosik*, 614 N.E.2d 551, 553-54 (Ill. App. Ct. 1993) ("no theory can be based on circumstantial evidence unless the facts relied upon are of such a nature and so related to each other that [proximate cause] is the only conclusion that can reasonably be drawn from them"), the Supreme Court of Illinois has predictably instructed that the rules here are the same as always: in a negligence action, as elsewhere, "[t]he use of circumstantial evidence is not limited

---

[2] The court notes in passing that neither party has discussed any of the other elements of a negligence theory of defective-products liability, including the question whether Defendants breached the applicable standard of care—for in a negligence claim, the focus is ultimately on the conduct of the manufacturer, not just the state of the allegedly defective product. *See generally Blue v. Envtl. Eng'g, Inc.*, 828 N.E.2d 1128 (Ill. 2005). But as the parties have only put causation at issue for purposes of summary judgment, the court limits its analysis accordingly.

[3] The real issue in this case and in the Illinois appellate cases cited by the parties is not proximate cause but rather what evidence is needed to ground a reasonable inference of cause in fact. But nothing of substance will turn on the choice of terminology for present purposes, so the court will follow this usage for the sake of convenience.

to those instances in which the circumstances support only one logical conclusion. Instead, circumstantial evidence will suffice whenever an inference may reasonably be drawn therefrom, and the facts established by such inferences are considered when an issue is decided as a matter of law . . . ." *Mort v. Walter*, 457 N.E.2d 18, 21 (Ill. 1983). A reasonable inference of proximate cause does require more than mere "speculation, surmise, or conjecture," *see Majetich v. P.T. Ferro Constr. Co.*, 906 N.E.2d 713, 717 (Ill. App. Ct. 2009), that is, more than a showing of bare "possibility" as opposed to "probability." *See Wrobel v. City of Chicago*, 742 N.E.2d 401, 408 (Ill. App. Ct. 2000). But the undisputed facts in this case fund an inference of proximate cause that is more than mere "speculation;" it is a "probable" (though not the only "possible") explanation of the source of Baugh's injuries.

The undisputed facts reveal at least this much: Baugh told his wife Sharon that he planned to change the rusty gutter screws on their house. Shortly before his accident, Baugh was in his garage working with his toolbox. Shortly after the accident, he was laying on the ground in the northwest corner of his driveway, where a gutter runs along his house above the garage door. His head was split open, his eyes were glazed, and he was nonresponsive. He had a screwdriver in his hand, and a package of gutter screws was sitting atop his toolbox in the garage. Nearby on the driveway were a pool of blood and a broken Cuprum ladder, laying on its side, in the open position, with its right-side rail bent upward below the lower brace.

In the face of these undisputed facts, Defendants maintain that "[t]here is absolutely no evidence, direct or circumstantial, that the plaintiff was ascending, descending, or standing on the ladder at the time of his accident." It is true that there is no "direct" evidence, but this fact— the same as Defendants' refrain that "there are no eyewitnesses to the fall"—shows nothing if the circumstantial evidence supports a reasonable inference that the accident occurred while Baugh

was on the ladder, which it plainly does.

Defendants rely on *Snell v. The Village of University Park*, 542 N.E.2d 49, 52 (Ill. App. Ct. 1989), for the proposition that the court "cannot assume from the close proximity of the injured person to the defect that the defect was the cause of the fall." In *Snell*, the plaintiff was injured when she fell from her bicycle, and she alleged that the fall was caused by a defective condition in the defendant's curb. *Id.* at 50. However, "three of the witnesses stated that it did not appear that [plaintiff] or the bicycle came into contact with the curb before they fell," and "[plaintiff] failed to present other direct evidence that she struck the curb before she fell." *Id.* at 52. Thus, the *Snell* court's point was that an injured victim's mere proximity to a hazardous condition, standing alone, cannot defeat direct evidence that the victim never came into contact with the hazardous condition. This truism does nothing for Defendants, since there were no eyewitnesses to Baugh's accident; unlike the witnesses in *Snell*, nobody has testified that Baugh fell before he got onto (or after he got off of) his ladder.

The facts of *Snell* serve as a reminder that, from time to time, accidents happen in the vicinity of hazardous conditions without being caused by those conditions. Those conditions might be imposed by a roadside curb, *see id.* at 52; or by a shower stall at a country club, *see Kellman*, 560 N.E.2d at 889-90; or by a flight of stairs in a residential building, *see Strutz v. Vicere*, 906 N.E.2d 1261, 1263 (Ill. App. Ct. 2009); *Bickerman*, 614 N.E.2d at 552; *Hudson v. Twenty-Three East Adams Street Corp.*, 787 F. Supp. 141, 141 (N.D. Il. 1992) (Parsons, J.); or a by recreational slide in a public park, *see Salinas v. Chicago Park Dist.*, 545 N.E.2d 184, 185 (Ill. App. Ct. 1989). But Defendants' analogies to these various cases all elide an essential difference: in the present case, the injured victim's proximity to the particular kind of hazardous condition calls for a special explanation that the other cases do not. Children fall while riding

their bicycles in the street; people slip on the soap in the shower and trip over their own feet on the stairs; and so forth. These routine occurrences demand no special explanation, and they offer ready alternatives to the conclusion that a nearby hazard caused the accident—that is why mere "proximity," without more, amounts to speculation rather than reasonable inference in these cases. In contrast, people do not routinely fall to their driveways from parts unknown with enough force to split open their heads and sustain permanent, severe injuries while an open, broken, felled ladder just happens to be right there on the driveway, too, for entirely unrelated reasons. As always, there are many logical possibilities, but in sifting through them, a reasonable jury could surely conclude that Baugh more likely fell from the ladder—while executing his announced plan to change out the gutter screws—than from who-knows-where.

Of course, Baugh must show more than that he fell from the ladder; he must show that the ladder failed and caused him to fall. There is no dispute that the right-side rail of the ladder was bent upward below the brace when it was found laying on the driveway next to the injured Baugh. Baugh contends that the damage to the leg was the cause of the accident; Defendants counter that it could just as well have been the result of the accident, for all anyone knows—especially since there were no eyewitnesses. A reasonable jury could, in any event, conclude that the broken side rail precipitated the accident. Dr. Ambler testified that Baugh had no problems with dizziness and had not suffered a stroke; there is no evidence to suggest that Baugh fell on account of his health and damaged the ladder in the process. And Baugh's experts have told a very different story about the evidence yielded by their examinations of the ladder and its damage. Professor Vinson, for instance, testified that according to his structural analysis, the ladder would not withstand the stresses in the side rail and braces generated during normal use by someone of Baugh's far-from-unusual size and stature. He also testified that there was no

evidence of misuse or overloading that would explain away the evidence of structural failure that he observed. Moreover, no other expert takes issue with his specific analysis or findings; when Professor Mostovoy opined that the ladder was made of an appropriate metal, he explicitly reserved any conclusion as to whether the ladder was, overall, "safe," since that was "a design issue, which [he] was not asked to do anything with."

Defendants accordingly mount two threshold arguments against the admissibility of any of Baugh's proffered expert-witness testimony, both of which merit only passing discussion. *First*, Defendants argue that since the record is "totally devoid of any competent evidence," no expert testimony could have an adequate factual basis. This argument is specious. The facts that Dr. Vinson, for example, would need to reach his conclusion that the subject ladder would not withstand the stresses when used properly by a man of Baugh's weight and dimensions are simply Baugh's weight and dimensions, along with various specifications of the subject ladder, none of which are in dispute.

*Second*, Defendants flatly proclaim that all tendered experts in this case are unqualified; "[t]he only exception of course is defendant's engineer, Tom Schmitt." The court disagrees. Professor Vinson, for instance, holds an endowed chair in Mechanical and Aerospace Engineering at the University of Delaware. He has authored eight books and over two hundred articles in the areas of engineering mechanics and structural analysis, including at least two papers on the analysis of aluminum-stepladder performance in the Proceedings of the American Society of Mechanical Engineers.[4] Defendants' attack on his credentials is conclusory and without basis. There is no need, at this juncture, to sift through the testimony of the other tendered experts; Professor Vinson's testimony, viewed in conjunction with the circumstantial

---

[4] Professor Vinson's full CV is available at http://www.me.udel.edu/Faculty/Vinson_CV_11-07.pdf (last accessed January 7, 2010). *See* "Publications – National Journals or Meetings," entries 222, 230.

evidence, is enough to raise a genuine issue of material fact as to the cause of Baugh's accident. In due course, a jury can decide for itself how much weight the testimony of any of Baugh's experts deserves. Defendants are not entitled to summary judgment on his negligence claim.

*Strict Liability*

With respect to Baugh's strict-liability claim, Defendants contend that his right of action has been extinguished by Illinois' statute of repose for products-liability actions. The statute provides, in relevant part:

> [N]o product liability action based on the doctrine of strict liability in tort shall be commenced except within the applicable limitations period and, in any event, within 12 years from the date of first sale, lease or delivery of possession by a seller or 10 years from the date of first sale, lease or delivery of possession to its initial user, consumer, or other non-seller, whichever period expires earlier, of any product unit that is claimed to have injured or damaged the plaintiff, unless the defendant expressly has warranted or promised the product for a longer period and the action is brought within that period.

735 ILCS 5/13-213(b). Because a statute of repose operates as an affirmative defense under Illinois law, Defendants must "establish the factual position" required to support it. *Willett v. Cessna Aircraft Co.*, 851 N.E.2d 626, 635 (Ill. App. Ct. 2006) (citing and quoting *Soderland Brothers, Inc. v. Carrier Corp.*, 663 N.E.2d 1, 7 (Ill. 1995)). Defendants have not carried this burden at summary judgment, which must therefore be denied.

In order to prevail on their affirmative defense, Defendants must show that Baugh failed to bring this action (a) within twelve years of the date that the manufacturer first sold his ladder (i.e., to another seller), *or* (b) within ten years of the date that his ladder was sold to the first noncommercial user, whichever period expired first. *See* 735 ILCS 5/13-213(b); *Garza v. Navistar Int'l Transp. Corp.*, 666 N.E.2d 1198, 1201 (Ill. 1996). The record does not establish either date; Defendants have only shown that Baugh's ladder was manufactured on October 24, 1994. Nothing in the record shows when Defendants sold Baugh's ladder to a distributor or

retailer or any other seller. Nor does the record show when Baugh purchased the ladder, or even whether he was the initial consumer. Without these dates, Defendants cannot show that Baugh's right of action has been extinguished by the statute of repose.

Contrary to Defendants' assertion, Schmitt's deposition testimony does not establish either of these dates; Schmitt merely testified to the typical timeframe for a model no. 608-05 ladder to move from production to retail sale in response to counsel's explicitly hypothetical questions. At no point did Schmitt produce any evidence or documentation as to when *Baugh's* ladder was sold or what happened to it post-production, and his conclusory assurance (in response to counsel's leading question) that he was "100 percent certain" that such a ladder would have been sold to the initial user in August or September of 1995 cannot change that.

It is Defendants' burden to establish a factual basis for their affirmative defense with competent evidence. They have not done so, and summary judgment on Baugh's strict-liability claim must therefore be denied.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: January 12, 2010**