# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JOHN BAUGH, by and through his wife and next friend, SHARON BAUGH, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 4204 |
| v. | ) ) ) | Judge John Z. Lee |
| CUPRUM S.A. De C.V., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Following a trial, a jury awarded $11,142,928.82 in damages to Plaintiff John Baugh ("Baugh") for injuries suffered while using a ladder designed and manufactured by Defendant Cuprum S.A. De C.V. ("Cuprum"). Cuprum now moves for judgment as a matter of law, or in the alternative, for a new trial. For the following reasons, those motions are denied.

## Background

On August 1, 2006, a neighbor discovered Baugh sitting in his driveway holding a screwdriver and bleeding from his head. Tr. Vol. 2 at 128:2–6, 159: 17, 165:2–6, 17–18. Moments before, Baugh had been using a Cuprum ladder while replacing screws on a gutter in front of his home. *Id.* at 181:7–9. Now that ladder was strewn across the driveway, its right leg bent, its left leg twisted, and its pail shelf dented. *Id.* at 137:18, 172:14; Tr. Vol. 3 at 515:23–25; Tr. Vol. 6 at 1060:8–12. Baugh quite clearly fell from the ladder and struck his head. Less obvious, however, was whether some defect in the ladder's design caused it to buckle underneath Baugh, or whether the fall was simply a tragic accident caused by Baugh himself. Baugh filed this suit, alleging the former. But with brain injuries rendering Baugh incapable of testifying and

no other witness to the fall, the parties would be forced to rely on experts to reconstruct the events of that day.

Baugh argued at trial that he used the ladder properly—that is, placing it in front of the house so that he would be facing the gutter while he worked—but that the ladder gave out from underneath him. Tr. Vol. 6 at 1404:2–21. To prove this theory, Baugh first offered the expert testimony of Dr. Jack Vinson, a mechanical engineer and professor at the University of Delaware. Tr. Vol. 2 at 216:15–18. Dr. Vinson explained the differences between dynamic loads—which exert varying amounts of force—and static loads—which exert a constant amount of force. *Id.* at 224:17 to 225:14. Dr. Vinson then opined that, given the ladder's long, thin construction, a 200-pound user like Baugh could exert a combination of forces that would exceed the strength of the Cuprum ladder, causing it to buckle. *Id.* at 236:17 to 237:21. Dr. Vinson ultimately concluded that the ladder's side rails and supporting gussets failed because they were too thin and that a thicker design would have prevented the accident. *Id.* at 258:23 to 260:17. Dr. Vinson never tested his proposed thicker ladder construction, although he claimed a lab experiment or computer reconstruction was unnecessary given his mathematical calculations. *Id.* at 277:17 to 279:6; Tr. Vol. 3 at 452:2 to 453:8.

Baugh also presented the expert testimony of Kevin Smith, a mechanical engineer, who similarly opined that the ladder failed structurally. Tr. Vol. 3 at 507:13–20, 515:1–3. Smith testified that he studied the bent ladder rail and concluded "its geometry and configuration was such that it could not handle the load being put onto the leg." *Id.* at 515:9–13. Smith further noted that damage to other parts of the ladder were consistent with the ladder's leg collapsing underneath Baugh. *Id.* at 515:14 to 516:25. According to Smith, the damage to the left leg of the ladder suggests that the right leg first collapsed, causing the ladder to twist and fall to the

right, placing an "outward load on that left ladder leg as it falls over." *Id.* at 515:23–25. Smith further concluded that, prior to the fall, the ladder had been set up so that Baugh would climb the ladder facing the house. *Id.* at 530:11–14.

In contrast, Cuprum's theory at trial was that Baugh had misused the ladder, placing it in an adjacent flower bed in such a manner that his back faced the house as he climbed the ladder. *Id.* at 1441:12–23. According to Cuprum, this allowed Baugh to brace himself against the facade, but also involved him stepping too high up onto the ladder's pail shelf and forced him to awkwardly position his body to work on the gutter. *Id.* This consequently caused the pail shelf, which is not designed to be a step, to bend from the excess weight, causing Baugh to lose his balance and the ladder to topple over. *Id.* Expert witnesses Dr. Michael Stevenson and Michael Van Bree, both engineers with Engineering Systems Incorporated, testified for Cuprum at trial.

According to Cuprum's experts, the bending of the ladder's right side rail occurred because Baugh fell on top of the ladder, not because the ladder failed structurally. Tr. Vol. 7 at 1257:10–11. Dr. Stevenson noted that the ladder was twenty percent stronger than standards suggested by the American National Standards Institute ("ANSI")[1] and opined that the gusset could not have failed causing the rail to bend; Van Bree agreed with this conclusion. Tr. Vol. 5 at 902:17–19, 909:1–5; Tr. Vol. 6 at 1056:19–25.

Van Bree further testified that, in his opinion, Baugh misused the ladder by standing on its pail shelf, which could only support 100 pounds for one minute without failure. Tr. Vol. 6 at 1060:3 to 1061:2. This hypothesis, according to Van Bree, is supported by the damage to the pail shelf and Van Bree's own replication of the damage through testing. *See id.* Van Bree also visited the Baugh home and concluded that for Baugh to reach the gutter screws he intended to

---

[1] The ANSI is a private, not-for-profit organization that promulgates "norms and guidelines" for various businesses and industry sectors. *See* ABOUT ANSI, http://www.ansi.org/about_ansi/overview/overview.aspx?menuid=1 (last visited Nov. 24, 2015).

3

replace, he could not have placed the ladder on the concrete driveway. *Id.* at 1079:18 to 1080:4. Instead, he would have had to have placed it in the uneven flower bed. *Id.* This misplacement of the ladder coupled with Baugh climbing up onto the pail shelf caused the fall, according to Cuprum. Tr. Vol. 8 at 1440:14 to 1441:25.

## Legal Standard

On a motion for judgment as a matter of law filed pursuant to Fed. R. Civ. P. 50, the Court inquires whether the evidence and all reasonable inferences are sufficient to support the verdict when viewed in a light most favorable to nonmovant. *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 629 (7th Cir. 1996). In other words, the Court is "limited to assessing whether no rational jury could have found for the plaintiff," and should grant the motion "only where there can be but one conclusion from the evidence." *Id.* at 630, 636.[2]

Rule 59 of the Federal Rules of Civil Procedure governs motions for a new trial. Fed. R. Civ. P. 59. Under Rule 59, it is in the Court's discretion to grant a new trial "if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003).

## Analysis

**I.  Motion for Judgment as a Matter of Law**

Cuprum argues judgment should be granted in its favor as a matter of law because at trial Baugh "did not meet his evidentiary burden, offering only surmise and conjecture." Def.'s Mot.

---

[2] Cuprum divides this motion into two portions, arguing first that it "was entitled to a directed verdict at the close of plaintiff's case," or alternatively "at the close of all evidence." Def.'s Mot. 3, 11. The same standard governs both types of Rule 50 motions. *See* 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (3d ed. 1998) ("The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)."). *Compare Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008) (setting out the standard for Rule 50(a)), *with E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 431 (7th Cir. 2012) (setting out the same standard for Rule 50(b)).

¶ 28. Specifically, Cuprum attacks the expert testimony of Dr. Vinson and Smith. *See id.* ¶¶ 7–25. According to Cuprum, Baugh's expert witnesses "agreed that the ladder met all ANSI requirements; that the aluminum from which the latter had been constructed was of the appropriate strength; that the ladder had no manufacturing defects; and that the ladder showed no evidence of pre-existing damage." *Id.* ¶ 28. These arguments are not persuasive.

First, while compliance with ANSI standards may be relevant evidence, "it is not a conclusive defense" to Baugh's products liability claim. *Romero v. Cincinnati Inc.*, 171 F.3d 1091, 1095 (7th Cir. 1999). What is more, Baugh did attack the design of the ladder during the trial by presenting experts, who opined that the ladder's right side rail was too thin to withstand the load exerted by Baugh as he used the ladder and that a gusset that braced one of the lower steps against the rail was not properly designed. *Id.* ¶¶ 20-21.

Furthermore, characterizing the parties as having "agree[d]" that the ladder was undamaged before the accident is inaccurate. *See* Def.'s Mot. ¶ 43. Cuprum highlights the issue of pre-existing damage because, in its view, only its theory of events could account for the damage to the ladder's pail shelf. *Id.* Baugh's wife testified she never noticed whether the pail shelf had been dented prior to the accident because she would not have used the pail shelf whenever she used the ladder. Tr. Vol. 5 at 867:10–13. Cuprum points to this testimony, insisting that the damage must have occurred during the fall and that only its experts could explain how this happened. Def.'s Mot. ¶ 43.

To be fair, Cuprum made the pail shelf far more of a focal point in its case, but to claim that Baugh's theory completely unaccounted for this damage is inaccurate. Baugh argued that it would be unrealistic to believe that he would stand on the ladder in the manner suggested by Cuprum; instead, Baugh maintained that it is more believable that the damage to the pail shelf

existed prior to the accident or happened as a result of impact from the fall. *See* Tr. Vol. 8 at 1398:20–25, 1400:8–18, 1401:25 to 1402:2. The jury agreed, and the Court does not believe this conclusion was so irrational in light of the evidence presented at trial as to nullify the verdict.

In addition to attacking Baugh's experts, Cuprum touts its own, arguing that "only [their] experts could explain how the accident occurred [and] only their explanation was thoroughly tested." Def.'s Mot. ¶ 43. These points, however, amount to nothing more than a brief summation of Cuprum's closing arguments and do not succeed in showing how no rational jury could have found for Baugh. For example, while Dr. Vinson may not have reconstructed a thicker ladder to physically test his proposed design, he still performed the mathematical calculations to show how the thicker rails and gussets would withstand the load. *See* Tr. Vol. 2 at 259:23 to 261:23.

Finally, Cuprum relies on the fact that Baugh's experts conceded that they "could never rule out . . . misuse of the ladder as the sole cause of the accident here." Def.'s Mot. ¶ 28. But this argument misrepresents Baugh's burden at trial. The preponderance of the evidence standard requires that Baugh prove his injuries were more likely than not caused by a design defect, not that his injuries could only have been so caused. *See*, *e.g.*, *Oines v. Bridgestone/Firestone N. Am. Tire, LLC*, 93 F. App'x 80, 81 (7th Cir. 2004). And giving all reasonable inferences in his favor, the Court finds Baugh presented sufficient evidence from which a jury could conclude that a design defect more likely than not caused his injuries. Consequently, Cuprum's motion for judgment as a matter of law is denied.

## II. Motion for New Trial

Cuprum additionally moves for a new trial asserting a number of reasons. Specifically, Cuprum contends: (1) the jury verdict is against the manifest weight of the evidence; (2) the

damage award of $11.1 million "is excessive and contrary to the manifest weight of the evidence"; (3) all of its motions *in limine* that were denied "should have been granted in their entirety"; (4) its motion to strike the testimony of Kevin Smith should have been granted; (5) "[t]he court improperly prohibited defense counsel from asking Mr. Van Bree about the April 2008 ANSI committee meeting he attended with Dr. Vinson"; (6) "[t]he court improperly prohibited defense counsel from asking Tom Schmitt in the defense case to explain why defendant changed the gusset in Type III aluminum stepladders after the accident"; (7) all of Cuprum's proposed jury instructions that "were denied in whole or in part should have been given in their entirety"; (8) Cuprum's objections to jury instructions 24A and 24B should have been sustained; (9) "[t]he court improperly overruled defendant's objection and refused to strike the statements made by plaintiff's counsel in closing argument that plaintiff had proven how his theory of the accident could result in inward movement of the ladder's right lower side rail while all four feet of the ladder were on concrete"; and (10) "[t]he court improperly overruled defendant's objection and refused to strike the statements made by plaintiff's counsel in closing argument justifying plaintiff's future damage request by using the past damages as a factor." Def.'s Mot. ¶¶ 45–60.

As a threshold matter, the Court notes that Cuprum has adopted a "kitchen sink" approach to its motion for a new trial raising a large number of alleged trial errors. In so doing, Cuprum does little more than provide a sentence or two raising the issue, reference any prior briefing or argument, and offer little to no legal support. *See id.* This is plainly insufficient. For example, Cuprum claims "[a]ll of [its] motions *in limine* [that] were denied in whole or in part should have been granted in their entirety for the reasons set forth in those motions and incorporated by reference here." *Id.* ¶ 47. In one sentence, Cuprum has effectively asked the

7

Court to go back and review each of its prior rulings with no guidance whatsoever as to how those rulings constitute error. Further, assuming for the sake of argument that any of these rulings did amount to error, Cuprum makes no attempt to explain how that error resulted in prejudice that warrants a new trial. It is simply "not the obligation of this court to research and construct legal arguments open to parties." *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (citing *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003)). Accordingly, Cuprum has failed to demonstrate that these issues warrant a new trial, and its motion for a new trial is denied.

## Conclusion

For these reasons, the Court denies Defendant's motion for judgment as a matter of law, or in the alternative, for a new trial [414]. Civil case terminated.


**SO ORDERED**            ENTER: 12/22/15

                                                           _____
                                                           **JOHN Z. LEE**
                                                           **United States District Judge**